## MILLER, DIRECTOR, DEPARTMENT OF CHILDREN AND FAMILY SERVICES OF ILLINOIS, ET AL. v. YOUAKIM ET AL.

No. 77-742.  Argued October 30, 1978—Decided February 22, 1979

MARSHALL, J., delivered the opinion of the Court, in which all other Members joined except STEVENS, J., who took no part in the consideration or decision of the case.

*Paul J. Bargiel,* Assistant Attorney General of Illinois, argued the cause for appellants. With him on the briefs were *William J. Scott,* Attorney General, and *Imelda R. Terrazino,* Assistant Attorney General.

*Robert E. Lehrer* argued the cause for appellees. With him on the brief were *Patrick A. Keenan, Robert P. Burns,* and *James D. Weill.**

MR. JUSTICE MARSHALL delivered the opinion of the Court.

At issue in this appeal is whether Illinois may exclude from its Aid to Families with Dependent Children-Foster Care program children who reside with relatives.

The Aid to Families with Dependent Children-Foster Care program (AFDC–FC) authorizes federal financial subsidies

---

*Briefs of *amici curiae* urging affirmance were filed by *Solicitor General McCree* for the United States; and by *Michael B. Trister* and *Marian Wright Edelman* for the American Orthopsychiatric Assn. et al.

for the care and support of children removed from their homes and made wards of the State pursuant to a judicial determination that the children's homes were not conducive to their welfare. §§ 408 (a)(1), (2) of the Social Security Act of 1935 (Act), as amended, 42 U. S. C. §§ 608 (a)(1), (2).[1]  To

---

[1] Section 408 of the Act, 42 U. S. C. § 608, sets forth the provisions governing the Foster Care program:

"Payment to States for foster home care of dependent children; definitions

"Effective for the period beginning May 1, 1961—

"(a) the term 'dependent child' shall, notwithstanding section 606 (a) of this title, also include a child (1) who would meet the requirements of such section 606 (a) or of section 607 of this title except for his removal after April 30, 1961, from the home of a relative (specified in such section 606 (a)) as a result of a judicial determination to the effect that continuation therein would be contrary to the welfare of such child, (2) whose placement and care are the responsibility of (A) the State or local agency administering the State plan approved under section 602 of this title . . . , (3) who has been placed in a foster family home or child-care institution as a result of such determination, and (4) who (A) received aid under such State plan in or for the month in which court proceedings leading to such determination were initiated, or (B) (i) would have received such aid in or for such month if application had been made therefor, or (ii) in the case of a child who had been living with a relative specified in section 606 (a) of this title within 6 months prior to the month in which such proceedings were initiated, would have received such aid in or for such month if in such month he had been living with (and removed from the home of) such a relative and application had been made therefor;

"(b) the term 'aid to families with dependent children' shall, notwithstanding section 606 (b) of this title, include also foster care in behalf of a child described in paragraph (a) of this section—

"(1) in the foster family home of any individual, whether the payment therefor is made to such individual or to a public or nonprofit private child-placement or child-care agency, or

"(2) in a child-care institution, whether the payment therefor is made to such institution or to a public or nonprofit private child-placement or child-care agency . . . .

"(c) the number of individuals counted under clause (A) of section 603

128

qualify for Foster Care assistance, these children must be placed in a "foster family home or child-care institution." § 408 (a)(3), 42 U. S. C. § 608 (a)(3).[2] The basic AFDC program, already in existence when the Foster Care program was enacted in 1961, provides aid to eligible children who live with a parent or with a relative specified in § 406 (a) of the Act.[3] In administering these programs, Illinois distinguishes

(a)(1) of this title for any month shall include individuals . . . with respect to whom expenditures were made in such month . . . .

    .        .        .        .

"but only with respect to a State whose State plan approved under section 602 of this title—

"(e) includes aid for any child described in paragraph (a) of this section, and

"(f) includes provision for (1) development of a plan for each such child (including periodic review of the necessity for the child's being in a foster family home or child-care institution) to assure that he receives proper care and that services are provided which are designed to improve the conditions in the home from which he was removed or to otherwise make possible his being placed in the home of a relative specified in section 606 (a) of this title . . . .

"For purposes of this section, the term 'foster family home' means a foster family home for children which is licensed by the State in which it is situated or has been approved, by the agency of such State responsible for licensing homes of this type, as meeting the standards established for such licensing; and the term 'child-care institution' means a nonprofit private child-care institution which is licensed by the State in which it is situated or has been approved, by the agency of such State responsible for licensing or approval of institutions of this type, as meeting the standards established for such licensing."

[2] The eligibility requirements of the AFDC–FC program are contained in the statutory definition of "dependent child," § 408 (a). See n. 1, supra.

[3] The eligibility criteria for the basic AFDC program are set forth in its statutory definition of "dependent child," § 406 (a) of the Act, 42 U. S. C. § 606 (a):

"When used in this part—

"(a) The term 'dependent child' means a needy child (1) who has been deprived of parental support or care by reason of the death, continued

between related and unrelated foster parents. Children placed in unrelated foster homes may participate in the AFDC–FC program. But those who are placed in the homes of relatives listed in § 406 (a), and who are entitled to basic AFDC benefits, cannot receive AFDC–FC assistance because the State defines the term "foster family home" as a facility for children unrelated to the operator.[4] Foster children living with relatives may participate only in Illinois' basic AFDC program, which provides lower monthly payments than the Foster Care program.[5] The specific question presented here is whether Illinois has correctly interpreted the federal standards for AFDC–FC eligibility set forth in § 408 (a) of the Act to exclude children who, because of placement with related rather than unrelated foster parents, qualify for assistance under the basic AFDC program.

## I

Appellees are four foster children, their older sister (Linda Youakim), and her husband (Marcel Youakim). In 1969, Illinois removed the children from their mother's home and made them wards of the State following a judicial determina-

---

absence from the home, or physical or mental incapacity of a parent, and who is living with his father, mother, grandfather, grandmother, brother, sister, stepfather, stepmother, stepbrother, stepsister, uncle, aunt, first cousin, nephew, or niece, in a place of residence maintained by one or more of such relatives as his or their own home, and (2) who is (A) under the age of eighteen, or (B) under the age of twenty-one and (as determined by the State in accordance with standards prescribed by the Secretary) a student regularly attending a school, college, or university, or regularly attending a course of vocational or technical training designed to fit him for gainful employment."

[4] Ill. Ann. Stat., ch. 23, § 2212.17 (Supp. 1978). See infra, at 130–131.

[5] Illinois, like most other States, has consistently authorized substantially greater AFDC–FC payments than basic AFDC benefits. See 25 Soc. Sec. Bull., No. 2, Tables 10, 14, pp. 28, 30 (Feb. 1962); U. S. Dept. of HEW, Public Assistance Statistics: April 1977, Tables A, B, 4, 6, 7 (Sept. 1977); infra, at 130, 131.

tion of neglect. The Department of Children and Family Services (Department), which became responsible for the children,[6] placed them in unrelated foster care facilities until 1972. During this period, they each received full AFDC–FC benefits of $105 a month. In 1972, the Department decided to place two of the children with the Youakims, who were under no legal obligation to accept or support them.[7] The Department investigated the Youakim home and approved it as meeting the licensing standards established for unrelated foster family homes, as required by state law.[8] Despite this approval, the State refused to make Foster Care payments on behalf of the children because they were related to Linda Youakim.

The exclusion of foster children living with related caretakers from Illinois' AFDC–FC program reflects the State's view that the home of a relative covered under basic AFDC is not a "foster family home" within the meaning of § 408 (a)(3), the federal AFDC–FC eligibility provision at issue here. Interpreting that provision, Illinois defines a "foster family home" as

> "a facility for child care in residences of families who receive no more than 8 children *unrelated to them* . . . for the purpose of providing family care and training for

[6] See Ill. Rev. Stat., ch. 37, § 705–7 (1)(f) (1975); Ill. Ann. Stat, ch. 23, § 5005 (Supp. 1978), as amended, Pub. Act 80–1124, 1977 Ill. Laws 3367; Pub. Act 80–1364, Ill. Legis. Serv. 713 (West 1978).

[7] See Ill. Ann. Stat., ch. 23, § 10–2 (Supp. 1978).

[8] Ch. 23, §§ 4–1.2 and 2217 (Supp. 1978); Illinois Department of Children and Family Services, Child Welfare Manual 2.8.2 (1976) (hereinafter DCFS Welfare Manual). The DCFS Welfare Manual recently has been revised to conform to the decisions below.

The Agency documented its approval in two "Relative Home Placement Agreements" which were identical, both in form and in obligations imposed, to those used for unrelated foster care placements, except that the term "foster" was sometimes crossed out, two references were made to the familial relationship among appellees, and the usual promise of AFDC–FC benefits was deleted. See 431 F. Supp. 40, 43–44, and nn. 4, 5 (ND Ill. 1976); App. 20–23.

the children on a full-time basis. . . ." Ill. Ann. Stat., ch. 23, § 2212.17 (Supp. 1978) (emphasis added).[9]

Homes that do not meet the definition may not be licensed,[10] and under state law, only licensed facilities are entitled to Foster Care payments.[11]

Although Illinois refused to make Foster Care payments, it did provide each child basic AFDC benefits of approximately $63 a month, substantially less than the applicable $105 AFDC–FC rate.[12] The Youakims, however, believed that these payments were insufficient to provide proper support, and declined to accept the other two children. These children remain in unrelated foster care facilities and continue to receive AFDC–FC benefits.

In 1973, the Youakims and the four foster children brought a class action under 42 U. S. C. § 1983 for themselves and persons similarly situated, challenging Illinois' distinction between related and unrelated foster parents as violative of the Equal Protection Clause of the Fourteenth Amendment. A three-judge District Court certified the class, but granted

---

[9] Similarly, the phrase "facility for child care," which is used to define "foster family home," includes

"any person, group of persons, agency, association or organization, whether established for gain or otherwise, who or which receives or arranges for care or placement of one or more children, *unrelated to the operator of the facility* . . . ." Ill. Ann. Stat., ch. 23, § 2212.05 (Supp. 1978) (emphasis added).

[10] See §§ 2213–2215; DCFS Welfare Manual 2.8.2.

[11] See Ill. Ann. Stat., ch. 23, § 5005 (Supp. 1978).

[12] As an exception to this benefit differential, the State has authorized special supplemental payments, upon an adequate showing of need by related foster parents, to bring basic AFDC related foster care assistance up to $105 per month. Brief for Appellants 5; 374 F. Supp. 1204, 1206 (ND Ill. 1974). Since September 1, 1974, the Youakims have received these need-based payments for their foster children. This Court previously held that receipt of the supplemental benefits does not render the case moot. *Youakim* v. *Miller,* 425 U. S. 231, 236 n. 2 (1976) (*per curiam*).

summary judgment for the state officials on the constitutional claim. 374 F. Supp. 1204 (ND Ill. 1974).

While the direct appeal from the summary judgment was pending in this Court, the Department of Health, Education, and Welfare (HEW) issued a formal interpretation of the scope of the federal AFDC–FC program, providing in pertinent part:

"When a child has been removed from his home by judicial determination and is placed in foster care under the various conditions specified in Section 408 of the Social Security Act and 45 CFR 233.110, the foster care rate of payment prevails regardless of whether or not the foster home is operated by a relative." HEW Program Instruction APA–PI–75–9 (Oct. 25, 1974).

In light of this administrative interpretation, we vacated the judgment and directed the District Court to consider whether the Illinois foster care scheme is inconsistent with the Social Security Act and therefore invalid under the Supremacy Clause, U. S. Const., Art. VI, cl. 2. *Youakim* v. *Miller,* 425 U. S. 231 (1976) (*per curiam*).

On remand, the District Court granted summary judgment for appellees, holding that the State's denial of AFDC–FC benefits and services to otherwise eligible foster children who live with relatives conflicts with §§ 401 and 408 of the Social Security Act. 431 F. Supp. 40, 45 (ND Ill. 1976).[13] It found that under the "plain words" of § 408, dependent children adjudged to be wards of the State, removed from their homes, and placed in approved foster homes are entitled to AFDC–FC benefits, regardless of whether their foster parent is a relative. 431 F. Supp., at 44–45. In so ruling, the court relied on HEW's interpretive ruling and on the national policy em-

---

[13] The District Court had pendent jurisdiction under 28 U. S. C. § 1343 (3) to consider this statutory issue. See *Youakim* v. *Miller, supra,* at 236; *Hagans* v. *Lavine,* 415 U. S. 528 (1974).

bodied in § 401 of the Act to "encourag[e] the care of dependent children in their own homes or in the homes of relatives." 431 F. Supp., at 44. Since the State had approved the Youakim home as meeting the licensing standards for unrelated foster homes, the District Court concluded that the requirements of § 408 had been satisfied. 431 F. Supp., at 43–44.

The Court of Appeals unanimously affirmed the judgment of the District Court. 562 F. 2d 483 (CA7 1977).[14] It held that the statutory definition of "foster family home" in the last sentence of § 408 does not exclude relatives' homes, and found no "implied legislative intent" to create such an exclusion. 562 F. 2d, at 487; see id., at 486 n. 4. Accordingly, the Court of Appeals concluded that any home approved as meeting the State's licensing standards is a "foster family home" within the meaning of § 408. 562 F. 2d, at 486, 490.

We noted probable jurisdiction, 434 U. S. 1060 (1978), and now affirm.

## II

A participating State may not deny assistance to persons who meet eligibility standards defined in the Social Security Act unless Congress clearly has indicated that the stand-

---

[14] It appears that every other court to consider the issue has also concluded that dependent children who have been removed from their homes by judicial order and placed by a State in relatives' homes are entitled to AFDC–FC benefits. See Jones v. Davis, Civ. No. 76–805 (Ore., Apr. 8, 1977), appeal docketed, CA9, No. 77–2254; Alston v. Department of Health and Social Services, [1974–1976 Transfer Binder] CCH Poverty L. Rep. ¶ 22,336 (Wis. Cir. Ct., Jan. 21, 1976); Thompson v. Department of Health and Social Services, [1974–1976 Transfer Binder] CCH Poverty L. Rep. ¶ 22,303 (Wis. Cir. Ct., Jan. 9, 1976); Taylor v. Dumpson, 79 Misc. 2d 379, 362 N. Y. S. 2d 888 (Sup. Ct. 1974), vacated as moot, 37 N. Y. 2d 765, 337 N. E. 2d 600 (1975); Clampett v. Madigan, [1972–1974 Transfer Binder] CCH Poverty L. Rep. ¶ 17,979 (SD, May 24, 1973); Jackson v. Ohio Dept. of Public Welfare, Civ. No. C72–182 (ND Ohio, Apr. 17, 1972); Sockwell v. Maloney, 431 F. Supp. 1006, 1008, and n. 3 (Conn. 1976) (dicta), aff'd, 554 F. 2d 1236 (CA2 1977) (per curiam).

ards are permissive. See, *e. g., Burns* v. *Alcala,* 420 U. S. 575, 580 (1975); *Carleson* v. *Remillard,* 406 U. S. 598 (1972); *Townsend* v. *Swank,* 404 U. S. 282, 286 (1971); *King* v. *Smith,* 392 U. S. 309 (1968). Congress has specified that programs, like AFDC–FC, which employ the term "dependent child" to define eligibility must be available for "all eligible individuals." § 402 (a)(10), 42 U. S. C. § 602 (a)(10); see *Quern* v. *Mandley,* 436 U. S. 725, 740–743, and n. 18 (1978). Section 408 (e) reinforces this general rule by requiring States to provide Foster Care benefits to "any" child who satisfies the federal eligibility criteria of § 408 (a). Thus, if foster care in related homes is encompassed within § 408, Illinois may not deny AFDC–FC benefits when it places an eligible child in the care of a relative.

In arguing that related foster care does not fall within § 408's definition of "foster family home," appellants submit that Congress enacted the Foster Care program solely for the benefit of children not otherwise eligible for categorical assistance. We disagree. The purpose of the AFDC–FC program was not simply to duplicate the AFDC program for a different class of beneficiaries. As the language and legislative history of § 408 demonstrate, the Foster Care program was designed to meet the particular needs of all eligible neglected children, whether they are placed with related or unrelated foster parents.

## A

Section 408 (a), in defining "dependent child," establishes four conditions of AFDC–FC eligibility. First, the child must have been removed from the home of a parent or other relative specified in § 406 (a), the basic AFDC eligibility provision, "as a result of a judicial determination to the effect that continuation therein would be contrary to the welfare of such child." § 408 (a)(1), 42 U. S. C. § 608 (a)(1). Second, the State must remain responsible for the placement and care of the child. § 408 (a)(2), 42 U. S. C. § 608 (a)(2). Third, the

child must be placed in "a foster family home or child-care institution." § 408 (a)(3), 42 U. S. C. § 608 (a)(3). Fourth, the child must have been eligible for categorical assistance under the State's plan prior to initiation of the removal proceedings. § 408 (a)(4), 42 U. S. C. § 608 (a)(4).

The dispute in this case centers on the meaning of "foster family home" as used in the third eligibility requirement, § 408 (a)(3) of the Act. The statute itself defines this phrase in sweeping language:

> "[T]he term 'foster family home' means a foster family home for children which is licensed by the State in which it is situated or has been approved, by the agency of such State responsible for licensing homes of this type, as meeting the standards established for such licensing." § 408, 42 U. S. C. § 608 (last sentence).

Congress manifestly did not limit the term to encompass only the homes of nonrelated caretakers. Rather, any home that a State approves as meeting its licensing standards falls within the ambit of this definitional provision. That Congress intended no distinction between related and unrelated foster homes is further demonstrated by the AFDC–FC definition of "aid to families with dependent children," which includes foster care for eligible children who live "in the foster family home *of any individual.*" § 408 (b)(1), 42 U. S. C. § 608 (b)(1) (emphasis added). Far from excluding related caretakers, the statute uses the broadest possible language when it refers to the homes of foster parents.

Appellants concede that these provisions do not explicitly bar from the Foster Care program children living with related foster parents. Juris. Statement 11; Brief for Appellants 22; Reply Brief for Appellants 5; 562 F. 2d, at 486, and n. 4. Nevertheless, they infer from two isolated passages of § 408 a congressional intent to except relatives' homes from the definition of "foster family home."

Appellants first rely on the definition of dependent children in §§ 408 (a)(1) and (3). These provisions state in relevant part:

"(a) the term 'dependent child' shall, notwithstanding section [406 (a)—the basic AFDC eligibility provision], *also* include a child (1) who would meet the requirements of such section [406 (a)] except for his removal . . . from the home of a relative (specified in such section [406 (a)]) as a result of a judicial determination to the effect that continuation therein would be contrary to the welfare of such child . . . , [and] (3) who has been placed in a foster family home." (Emphasis added.)

Appellants construe the "notwithstanding" language of § 408 (a)(1) in conjunction with § 408 (a)(3) as creating a class of AFDC–FC beneficiaries distinct from the dependent children covered under basic AFDC. In their view, "notwithstanding § 406 (a)" means that the Foster Care definition of "dependent child" both suspends the basic AFDC requirement that the child reside with a parent or close relative, and precludes a foster child who meets that requirement from participating in the AFDC–FC program. Under appellants' construction, §§ 408 (a)(1) and (3) would read: For the purpose of Foster Care aid, a "dependent child" shall *only* include a child who would meet the requirements of § 406 (a) except that he has been both removed from the home of a parent or relative specified in § 406 (a) and placed in a nonrelative's home.

The difficulty with this strained interpretation is that § 408 (a)(1) does not use the word "only." It states that a dependent child shall *"also"* include a child removed from the home of a parent or relative. Thus, there is no basis for construing language that unquestionably expands the scope of the term "dependent child" as implicitly contracting the definition to exclude a child who meets the eligibility criteria of § 406 (a). Because § 408 (a)(1) does not have the preclusive meaning

urged by appellants, it cannot implicitly modify the phrase "foster family home" in § 408 (a)(3) to denote solely unrelated homes. We think it clear that neither § 408 (a)(1) nor § 408 (a)(3) embodies a congressional intent to constrict the broad statutory definition of "foster family home."

Appellants next maintain that interpreting AFDC–FC to encompass foster care by relatives would render meaningless another provision of the program. Section 408 (f)(1) of the Act obligates States to ensure that

> "services are provided which are designed to improve the conditions in the home from which [the foster child] was removed *or* to otherwise make possible his being placed in the home of a relative specified in section [406 (a)]." 42 U. S. C. § 608 (f)(1) (emphasis added).

According to appellants, if related homes were "foster family homes," it would be unnecessary to require States to make the home of a relative suitable for placement when the foster child already lives in a relative's home.

By ignoring the critical word "or," appellants misconstrue the import of this provision. To be sure, § 408 (f) expresses a preference for the return of children to their original home or their transfer to the care of a relative. Congress, however, expressed this preference in the alternative. When a child is placed in related foster care, the State obviously can satisfy § 408 (f)(1) by working toward his ultimate return to the home from which he was removed, in this case the mother's home. Thus, § 408 (f)(1) is fully consonant with including in the AFDC–FC program foster children placed with relatives.

Had Congress intended to exclude related foster parents from the definition of "foster family home," it presumably would have done so explicitly, just as it restricted the definition of "child-care institution." [15] Instead, the statute plainly

---

[15] In contrast to the broad definition of "foster family home," the term "child-care institution" is explicitly qualified to exempt private institutions

states that a foster family home is the home of any individual licensed or approved by the State as meeting its licensing requirements, and we are unpersuaded that the provisions on which appellants rely implicitly limit that expansive definition.

## B

The legislative history and structure of the Act fortify our conclusion that the language of § 408 should be given its full scope. The Foster Care program was enacted in the aftermath of HEW's declaration that States could no longer discontinue basic AFDC assistance due to unsuitable home conditions "while the child continues to reside in the home." State Letter No. 452, Bureau of Public Assistance, Social Security Administration, Department of Health, Education, and Welfare (Jan. 17, 1961) (hereinafter Flemming Ruling). In directing States "either to improve the home conditions" or "make arrangements for the child elsewhere," *ibid.*, the Ruling prompted Congress to encourage state protection of neglected children.[16] Accordingly, Congress designed a program carefully tailored to the needs of children whose "home environments . . . are clearly contrary to the[ir] best interests,"[17] and it offered the States financial subsidies to implement the plan. Neither the legislative history nor the structure of the Act indicates that Congress intended to differentiate among neglected children based on their relationship to their

---

operated for profit and public institutions. § 408, 42 U. S. C. § 608 (last sentence).

[16] See S. Rep. No. 165, 87th Cong., 1st Sess., 6–7 (1961) (hereinafter S. Rep. No. 165); S. Rep. No. 1589, 87th Cong., 2d Sess., 12–13 (1962); Hearings on the Public Assistance Act of 1962 before the Senate Committee on Finance, 87th Cong., 2d Sess., 65 (1962) (memorandum from HEW Secretary Ribicoff to Sen. Byrd); Hearings on the Public Welfare Amendments of 1962 before the House Committee on Ways and Means, 87th Cong., 2d Sess., 294–297, 305–307 (1962).

[17] S. Rep. No. 165, pp. 6–7.

foster parents. Indeed, such a distinction would conflict in several respects with the overriding goal of providing the best available care for all dependent children removed from their homes because they were neglected. See S. Rep. No. 165, p. 6; 107 Cong. Rec. 6388 (1961) (remarks of Sen. Byrd).

Although a fundamental purpose of the Foster Care program was to facilitate removal of children from their homes, Congress also took steps to "safeguard" intact family units from unnecessary upheaval. See S. Rep. No. 165, p. 7; 107 Cong. Rec. 6388 (1961) (remarks of Sen. Byrd).[18] To ensure that children would be removed only from homes demonstrably inimical to their welfare, Congress required participating States to obtain "a judicial determination . . . that continuation in the home was contrary to the welfare of the child." S. Rep. No. 165, p. 7; see 108 Cong. Rec. 12693 (1962) (remarks of Sen. Eugene McCarthy); § 408 (a)(1). Protecting the integrity of established family units by mandating judicial approval of a State's decision to remove a child obviously is a goal that embraces all neglected children, regardless of who the ultimate caretaker may be. Yet under appellants' construction of § 408, the State would have no obligation to justify its removal of a dependent child if he were placed with relatives, since the child could not be eligible for Foster Care benefits. But the same child, placed in unrelated facilities, would be entitled under the Foster Care program to a judicial

---

[18] This precaution reflected Congress' awareness of the events that had culminated in the Flemming Ruling. In the years preceding the Ruling, there was considerable concern that States were using suitability rules intrusively to impose various moral and social standards on parents of dependent children. See *King* v. *Smith*, 392 U. S. 309, 321–327 (1968). For example, by threatening to discontinue basic AFDC aid or to initiate neglect proceedings, States had coerced many welfare mothers into "voluntarily" placing their children with relatives, although a court might not have ordered removal had formal proceedings been initiated. See *ibid.*; W. Bell, Aid to Dependent Children 124–136 (1965).

determination of neglect. The rights of allegedly abused children and their guardians would thus depend on the happenstance of where they are placed, which is normally determined after a court has found removal necessary. We are reluctant to attribute such an anomalous intent to Congress, particularly in the absence of any indication that it meant to protect from unnecessary removal only those dependent children placed with strangers.

Congress was also concerned with assuring that States place neglected children in substitute homes determined appropriate for foster care. See S. Rep. No. 165, pp. 6–7. To deter indiscriminate foster placements, Congress required that States establish licensing standards for every foster home, § 408 (definition of "foster family home"), and supervise the placement of foster children. § 408 (a)(2); see 45 CFR §§ 220.19 (a), 233.110 (a)(2)(i) (1977). The legislative materials at no point suggest that Congress intended to subject some foster homes, but not others, to minimum standards of quality, as could result if § 408 excluded relatives' homes from the definition of "foster family home." Indeed, in authorizing an approval procedure as an alternative to actual licensing of "foster family homes," [19] Congress evinced its understanding that children placed in related foster homes are entitled to Foster Care benefits. At the time the AFDC–FC program was enacted in 1961, many States exempted relatives' homes from the licensing requirements imposed on all other types of settings in which foster children could be placed.[20] It is

---

[19] § 408, 42 U. S. C. § 608 (last sentence).

[20] Colo. Rev. Stat. §§ 22–12–2, 22–12–3 (1953); Fla. Stat. § 409.05 (1961); Idaho Code §§ 39–1201, 39–1202 (1961); Ill. Rev. Stat., ch. 23, §§ 2304, 2310, 2314 (1961); Iowa Code Ann. §§ 237.2, 237.3, 237.8 (1949); Md. Ann. Code, Art. 88A, §§ 20, 21 (1957); Mo. Ann. Stat. § 210.211 (1952 and Supp. 1961); Mont. Rev. Codes Ann. §§ 10–520, 10–521 (1957); N. H. Rev. Stat. Ann. §§ 170:1–170:3 (1964); Pa. Stat. Ann., Tit. 11, §§ 801, 802 (Purdon 1939 and Supp. 1964); R. I. Gen. Laws §§ 40–14–2,

therefore likely that Congress, by including an approval procedure, meant to encompass foster homes not subject to State licensing requirements, in particular, related foster homes.

The specific services offered by the AFDC–FC program further indicate that Congress did not intend to distinguish between related and unrelated foster caretakers. Congress attached considerable significance to the unique needs and special problems of abused children who are removed from their homes by court order, distinguishing them as a class from other dependent children:

> "The conditions which make it necessary to remove [neglected] children from unsuitable homes often result in needs for special psychiatric and medical care of the children. . . .
>
> .  .  .  .  .
>
> "These are the most underprivileged children and often have special problems. . . ." 108 Cong. Rec. 12692–12693 (1962) (remarks of Sen. Eugene McCarthy).

Section 408 embodies Congress' recognition of the peculiar status of neglected children in requiring that States continually supervise the care of these children, § 408 (a)(2), develop a plan tailored to the needs of each foster child "to assure that he receives proper care," § 408 (f)(1), and periodically review both the necessity of retaining the child in foster care and the appropriateness of the care being provided. See ibid.; 45 CFR §§ 220.19 (b), (c), 233.110 (a)(2) (ii) (1977). Additionally, the States must work to improve the conditions in the foster child's original home or to transfer him to a relative when feasible, § 408 (f)(1); see supra, at 137. This procedure comports with Congress' preference for care of dependent children by relatives, a policy underlying the categorical assistance program since its inception in

---

40–14–11 (1956); Vt. Stat. Ann., Tit. 33, §§ 501, 502 (1959); Wis. Stat. § 48.62 (1957).

1935. See S. Rep. No. 628, 74th Cong., 1st Sess., 16–17 (1935); H. R. Rep. No. 615, 74th Cong., 1st Sess., 10–12 (1935); *Burns* v. *Alcala*, 420 U. S., at 581–582; § 401, as amended, 42 U. S. C. § 601, *supra*, at 132–133. We do not believe that Congress, when it extended assistance to foster children, meant to depart from this fundamental principle.[21] Congress envisioned a remedial environment to correct the enduring effects of past neglect and abuse. There is nothing to indicate that it intended to discriminate between potential beneficiaries, equally in need of the program, on the basis of their relationship to their foster parents.

That Congress had no such intent is also evidenced by the 1967 amendments to the Act, which increased the federal match-

---

[21] Despite the broad language of § 408 and the clear legislative goals behind the AFDC–FC program, appellants maintain that as a policy matter, relatives' homes should not constitute "foster family homes." They contend that permitting AFDC–FC assistance for foster children who live with relatives would create a "financial incentive" for relatives to refrain from caring for needy children until the children are removed from their homes by court order. Brief for Appellants 26. Even if this were true, "issue[s] of legislative policy . . . [are] better addressed to the wisdom of Congress than to the judgment of this Court." *Marquette Nat. Bank* v. *First of Omaha Service Corp.*, 439 U. S. 299, 319 (1978). Furthermore, we view the inclusion of related foster homes in § 408 as fully consistent with Congress' determination that homes of parents and relatives provide the most suitable environment for children. Congress evidently believed that encouraging relatives to care for these "most underprivileged children," 108 Cong. Rec. 12693 (1962) (remarks of Sen. Eugene McCarthy), whatever the cost, was worth the price. Indeed, if the State's interpretation of the statute were correct, relatives would have an incentive to refuse to accept foster children altogether. Concerned relatives might subordinate their interests in supervising the well-being of youngsters they love to ensure that these children receive the greater cash benefits and services available only to foster children placed in unrelated homes. Similarly, the availability of significantly more financial assistance under AFDC–FC might motivate child-placement authorities to refrain from placing foster children with relatives even when these homes are best suited to the needs of the child.

ing payments for AFDC–FC to exceed the federal share of basic AFDC payments.[22] The increase reflects Congress' recognition that state-supervised care and programs designed to meet the special needs of neglected children cost more than basic AFDC care.[23] The legislative history of the amendment reveals no basis for distinguishing between related and unrelated foster homes.[24] Rather, it discloses a generalized concern for the plight of all dependent children who should be sheltered from their current home environments but are forced to remain in such homes because of the States' inability to finance substitute care. S. Rep. No. 744, pp. 163–165; H. R. Rep. No. 544, pp. 100–101. Significantly, the Committee Reports suggest that increasing federal matching payments would encourage relatives "not legally responsible for support" to undertake the care of foster children "in order to obtain the best possible environment for the child." S. Rep. No. 744, p. 164; H. R. Rep. No. 544, p. 101. The amendments are therefore described, without qualification, as providing "more favorable Federal matching . . . for foster care for children removed from an unsuitable home by court order." S. Rep. No. 744, p. 4; H. R. Rep. No. 544, p. 4.

## C

Our interpretation of the statute and its legislative history is buttressed by HEW Program Instruction APA–PI–75–9,

---

[22] Social Security Amendments of 1967, Pub. L. 90–248, § 205 (b), 81 Stat. 892, § 403 (a)(1)(B) of the Social Security Act, as amended, 42 U. S. C. § 603 (a)(1)(B); see S. Rep. No. 744, 90th Cong., 1st Sess., 286 (1967) (hereinafter S. Rep. No. 744). These amendments also require all States that participate in the basic AFDC program to establish a Foster Care program. 81 Stat. 892, adding § 402 (a)(20) of the Act, 42 U. S. C. § 602 (a)(20).

[23] See S. Rep. No. 744, pp. 163–164; H. R. Rep. No. 544, 90th Cong., 1st Sess., 100–101 (1967) (hereinafter H. R. Rep. No. 544).

[24] Nor does the Illinois system indicate why such a distinction should be made. Since a related foster parent is subject to the same state-imposed responsibilities as a nonrelated foster parent, their costs must be equivalent.

144

which requires States to provide AFDC–FC benefits "regardless of whether the . . . foster family home in which a child is placed is operated by a relative." In reaching this conclusion, the Department of Health, Education, and Welfare reasoned:

> "A non-legally liable relative has no financial responsibility towards the child placed with him and the income and resources of such a relative are not factors in determining entitlement to a foster care payment. It must be noted, too, that the 1967 amendments to the Social Security Act liberalized Federal financial participation in the cost of foster care, recognizing foster family care is more costly than care in the child's own home." HEW Program Instruction APA–PI–75–9.

We noted in vacating the original three-judge District Court decision in this case that "[t]he interpretation of a statute by an agency charged with its enforcement is a substantial factor to be considered in construing the statute." *Youakim* v. *Miller*, 425 U. S., at 235–236, citing *New York Dept. of Social Services* v. *Dublino*, 413 U. S. 405, 421 (1973); *Columbia Broadcasting System, Inc.* v. *Democratic National Committee*, 412 U. S. 94, 121 (1973); *Investment Co. Institute* v. *Camp*, 401 U. S. 617, 626–627 (1971). Administrative interpretations are especially persuasive where, as here, the agency participated in developing the provision. *Adams* v. *United States*, 319 U. S. 312, 314–315 (1943); *United States* v. *American Trucking Assns.*, 310 U. S. 534, 549 (1940). HEW's Program Instruction is fully supported by the statute, its legislative history, and the common-sense observation that all dependent foster children are similarly in need of the protections and monetary benefits afforded by the AFDC–FC program.[25]

---

[25] Relying on *General Electric Co.* v. *Gilbert*, 429 U. S. 125, 142–143 (1976), appellants maintain that the Program Instruction conflicts with an earlier HEW pronouncement and therefore deserves little weight. They refer to an inconsistent interpretation of § 408 sent to Illinois authorities

## III

We think it clear that Congress designed the AFDC–FC program to include foster children placed with relatives. The overriding purpose of § 408 was to assure that the most appropriate substitute care be given to those dependent children so mistreated that a court has ordered them removed from their homes. The need for additional AFDC–FC resources—both monetary and service related—to provide a proper remedial environment for such foster children arises from the status of the child as a subject of prior neglect, not from the status of the foster parent.[26] Appellants attribute to Congress an intent to differentiate among children who are equally neglected and abused, based on a living arrangement bearing no relationship to the special needs that the AFDC–FC program was created to meet. Absent clear support in the statutory language or legislative history, we decline to make such an unreasonable attribution.

---

in 1971 by a regional HEW official, which stated that foster children placed in related homes are not eligible for Foster Care benefits under the federal program. However, this correspondence was not approved by HEW's General Counsel or by any departmental official in the national office. See letter from HEW's Assistant General Counsel to Illinois Special Assistant Attorney General Richard Ryan (Dec. 22, 1976), App. to Brief for United States as *Amicus Curiae* 1a. Since the letter did not reflect an official position, we take the Program Instruction to be the agency's first and only national interpretation concerning § 408's coverage of foster care by relatives. Appellants' reliance on *General Electric Co.* v. *Gilbert, supra,* is therefore misplaced, and we are bound by the "principle that the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong." *Red Lion Broadcasting Co.* v. *FCC,* 395 U. S. 367, 381 (1969) (footnote omitted); see *Board of Governors of the Federal Reserve System* v. *First Lincolnwood Corp.,* 439 U. S. 234, 251 (1978); *Zemel* v. *Rusk,* 381 U. S. 1, 11–12 (1965); *Udall* v. *Tallman,* 380 U. S. 1, 16–18 (1965).

[26] Illinois recognizes as much by providing special grants to some foster children placed with relatives which are not available to other basic AFDC recipients. See n. 12, *supra.*

Accordingly, we hold that the AFDC–FC program encompasses foster children who, pursuant to a judicial determination of neglect, have been placed in related homes that meet a State's licensing requirements for foster homes.

The judgment below is

*Affirmed.*

MR. JUSTICE STEVENS took no part in the consideration or decision of this case.